ROGERS, Circuit Judge,
concurring in the judgment in part and dissenting.
Ali Hamza Ahmad Suliman al Bahlul, a self-avowed member of al Qaeda who has been held in the Naval Base at Guantanamo Bay, Cuba since 2002, was convicted and sentenced to life imprisonment by a military commission for three offenses under the Military Commissions Act of 2006. The question before the en banc court is whether these charges support the jurisdiction of the military commission. See Order, Apr. 23, 2013. Because Bahlul’s conduct occurred prior to the enactment of the 2006 Act, and the military commission lacked jurisdiction to try these non-law-of-war offenses, Bahlul’s convictions must be vacated. The court is vacating Bahlul’s convictions for material support and solicitation. For the following reasons, I would also vacate Bahlul’s conviction for inchoate conspiracy.
I.
In Hamdan v. Rumsfeld, 548 U.S. 557, 590, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), the Supreme Court observed that “[t]he military commission, a tribunal neither mentioned in the Constitution nor created by statute, was born of military necessity.” Historically, such commissions have been used in three situations. Id. at 595, 126 S.Ct. 2749 (plurality op.); id. at 683, 126 S.Ct. 2749 (Thomas, J., dissenting). First, they have substituted for civilian courts where martial law has been declared. Second, they have tried civilians in occupied enemy territory or territory regained from an enemy where civilian government cannot function. Third, military commissions have been convened to try “enemies who in their attempt to thwart or impede our military effort have violated the law of war.” Ex Parte Quirin, 317 U.S. 1, 28-29, 63 S.Ct. 1, 87 L.Ed. 3 (1942). This third type of military commission is designed “to determine, typically on the battlefield itself, whether the defendant has violated the law of war.” Hamdan, 548 U.S. at 596-97, 126 S.Ct. 2749 (plurality op.); cf. id. at 641,126 S.Ct. 2749 (Kennedy, J., concurring in part). Its jurisdiction is thus limited to “offenses cognizable during time of war.” Id. at 596, 126 S.Ct. 2749 (plurality op.); see id. at *35 641, 126 S.Ct. 2749 (Kennedy, J., concurring in part).
“Trial by military commission raises separation-of-powers concerns of the highest order.” Id. at 638, 126 S.Ct. 2749 (Kennedy, J., concurring in part). “Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections.” Reid v. Covert, 354 U.S. 1, 21, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality op.); see id. at 41, 77 S.Ct. 1222 (Frankfurter, J., concurring in result); see also The Federalist No. 47, at 324 (James Madison) (J. Cooke ed., 1961) (warning against the “tyranny” created through the “accumulation of all powers legislative, executive and judiciary in the same hands”). A statute conferring judicial power outside the Article III courts “may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. ‘Slight encroachments create new boundaries from which legions of power can seek new territory to capture.’ ” Stern v. Marshall, — U.S.-, 131 S.Ct. 2594, 2620, 180 L.Ed.2d 475 (2011) (quoting Reid, 354 U.S. at 39, 77 S.Ct. 1222 (plurality op.)). Even when confronted with the exigencies of war, “[the Court] cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system.” Id.
The question presented by Bahlul’s appeal is the effect of the 2006 Act on these settled principles. Given “the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty,” Quirin, 317 U.S. at 19, 63 S.Ct. 2, this court must assure itself that the military commission had jurisdiction over the charged offenses of which Bahlul was convicted. See Hamdan, 548 U.S. at 611-12, 126 S.Ct. 2749 (plurality op.); id. at 683, 126 S.Ct. 2749 (Thomas, J., dissenting); Application of Yamashita, 327 U.S. 1, 17-18, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Qui-rin, 317 U.S. at 25, 63 S.Ct. 2; 10 U.S.C. § 950g(d). The court properly considers a challenge to the jurisdiction of a military commission at any time it is raised. See R.M.C. 907(b)(1), The Manual for Military Commissions, at 11-87 (2007) (“A charge or specification shall be dismissed at any stage of the proceedings if: (A) The military commission lacks jurisdiction to try the accused for the offense”); cf. Fed. R.CrvP. 12(h)(3) (“If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action”); Arbaugh v. Y & H Corp., 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (“The objection that a federal court lacks subject-matter jurisdiction, see Fed.R.Civ.P. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.”).
A.
Congress enacted the Military Commissions Act of 2006, Pub.L. No. 109-366, 120 Stat. 2600, to authorize the establishment of law-of-war military commissions and to establish procedures governing their use. The 2006 Act specifies the “[c]rimes triable by military commissions,” 10 U.S.C. § 950v, including offenses such as attacking civilians, id. § 950v(b)(2), taking hostages, id. § 950v(b)(7), and torture, id. § 950(b)(ll). Congress included an unequivocal statement of the purpose and effect of its enactment:
(a) PURPOSE.—The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies *36 those crimes for trial by military commission.
(b) EFFECT.—Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.
Id. § 950p (emphases added). The court must “presume that [the] legislature says in a statute what it means and means in a statute what it says there.” Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). The words used by Congress are to be understood in their ordinary, normal meaning, absent a contrary indication. See Freeman v. Quicken Loans, Inc., — U.S. -, 132 S.Ct. 2034, 2042, 182 L.Ed.2d 955 (2012).
The reference in Congress’s plain and unequivocal statement of purpose to “offenses that have traditionally been triable by military commissions,” 10 U.S.C. § 950p(a) (emphasis added), clearly indicates its intent to confine military commissions to their traditional role and jurisdiction, not to overturn settled principles. “Traditionally” is the adverbial form of the word “traditional,” which means “long-established” or “habitually done, used, or found.” The New Oxford American Dictionary 1785 (2d ed.2005). A “tradition[ ]” is readily identified and found in established practices; it is not based on a “few scattered ... anomalies.” NLRB v. Noel Canning, No. 12-1281, slip op. at 21 (U.S. June 26, 2014). To quote Henry James: “[I]t takes an endless amount of history to make even a little tradition.” The AMERICAN Soene 164 (1907). Thus sang Tevye in “Fiddler on the Roof’ of “Tradition” that has lasted for generations. Jerry Bock & Sheldon Harnick, Prologue—Tradition, on Fiddler on the Roof (RCA Victor 1964).
Congress’s unusual “effect” statement, that the 2006 Act’s provisions are “declarative of existing law,” 10 U.S.C. § 950p(b), amplifies its instruction in the statement of purpose to look to offenses traditionally triable by military commissions. Here, Congress expresses sensitivity to the implicit constitutional concerns arising from authorizing military commissions to try persons for conduct predating the 2006 Act. Its statement that the 2006 Act permits retroactive application only for offenses previously triable by military commission accords with the established “presumption against statutory retroactivity,” and is the very antithesis of a contrary “unambiguous directive” or “express command” requiring retroactivity. Landgraf v. USI Film Products, 511 U.S. 244, 263, 270, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); see also Colder v. Bull, 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (opinion of Chase, J.); Martin v. Hadix, 527 U.S. 343, 354, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999); Lindh v. Murphy, 521 U.S. 320, 325, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). This presumption is “deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.” Landgraf, 511 U.S. at 265, 114 S.Ct. 1483.
Ambiguity, if any, would arise, therefore, only in identifying the offenses that “have traditionally been triable by military commissions,” 10 U.S.C. § 950p(a), and the Supreme Court has provided clear guidance on the resolution of this question. Congress’s statement that the offenses it has listed are “declarative of existing law,” id. § 950p(b), is a legal conclusion that is subject to a judicial declaration of what the law is. See Marburg v. Madison, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803); see also Noel Canning, No. 12-1281, slip op. at 7. “[A] mistaken opinion of the legislature concerning the law[] does *37 not make law.” Postmaster-General v. Early, 25 U.S. 136, 148, 12 Wheat. 136, 6 L.Ed. 577 (1827); see also United States v. Stafoff, 260 U.S. 477, 480, 43 S.Ct. 197, 67 L.Ed. 358 (1923) (Holmes, J). Determining what offenses were “traditionally” tried by military commissions according to “existing law” at the time of the conduct underlying Bahlul’s convictions carries out Congress’s expressly stated purpose, and is not an attempt to rewrite the 2006 Act’s listing of offenses because Congress was mistaken, see Op. at 16.
At the time of Bahlul’s charged conduct, the relevant statute was Article 21 of the Uniform Code of Military Justice, 10 U.S.C. § 821 (2000). See Hamdan, 548 U.S. at 592-93, 126 S.Ct. 2749; see also Yamashita, 327 U.S. at 7, 66 S.Ct. 340; Quirin, 317 U.S. at 28, 63 S.Ct. 2. It confers jurisdiction on military commissions over “offenders or offenses that by statute or by the law of war may be tried by military commissions.” 10 U.S.C. § 821 (2000). The only offenses then listed by statute were spying and aiding the enemy, 10 U.S.C. §§ 904, 906 (2000). Because Bahlul was not charged with either of these offenses, the military commission trying him had jurisdiction only over violations triable by military commission under “the law of war.” See Hamdan, 548 U.S. at 613, 126 S.Ct. 2749; Yamashita, 327 U.S. at 17, 66 S.Ct. 340; Quirin, 317 U.S. at 29, 63 S.Ct. 2.
For more than seventy years, the Supreme Court has interpreted the “law of war” to mean the international law of war. In Quirin, examining the predecessor statute to 10 U.S.C. § 821—Article 15 of the Articles of War, which similarly referenced “offenders or offenses that by statute or by the law of war may be triable by such military commissions”—the Court stated that in Article 15 Congress had “sanction[ed], within constitutional limitations, the jurisdiction of military commissions to try persons and offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.” 317 U.S. at 27-28, 63 S.Ct. 2 (emphasis added). The Court reaffirmed its understanding that the law of war is a “branch of international law,” id. at 29, 63 S.Ct. 2, four years later in Yamashita. Discussing the jurisdiction of the military commission, the Court looked to the violations of the law of war “recognized in international law” and consulted the Hague Conventions and the Geneva Conventions. Yamashita, 327 U.S. at 14-16, 66 S.Ct. 340. “[W]hen a new legal regime develops out of an identifiable predecessor, it is reasonable to look to the precursor in fathoming the new law.” Johnson v. United States, 529 U.S. 694, 710, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000); see also Hamilton v. Rathbone, 175 U.S. 414, 421, 20 S.Ct. 155, 44 L.Ed. 219 (1899). More recently, in addressing Section 821 in Hamdan, the Court adhered to Quirin and Yamashita by looking to the body of international law governing armed conflict. See Hamdan, 548 U.S. at 602-03, 126 S.Ct. 2749 (plurality op.); id. at 641, 126 S.Ct. 2749 (Kennedy, J., concurring in part); see also Memorandum from the Office of Legal Counsel to the Attorney General 28, 30 (July 16, 2010), printed in New York Times v. United States, No. 13-422-cv, slip op. app. A (2d Cir. June 23, 2014) (describing the law of war as international law).
B.
To demonstrate that the offenses of which Bahlul was convicted are violations of the international law of war and within the jurisdiction of his military commission, Supreme Court precedent indicates that the “Government must make a substantial showing that the crime for which it seeks *38 to try a defendant by military commission is acknowledged to be an offense against the law of war.” Hamdan, 548 U.S. at 603, 126 S.Ct. 2749 (plurality op.). For instance, in Quiñn, the Court concluded that a military commission had jurisdiction to try “unlawful combatants” who surreptitiously entered the United States, discarding their uniforms on arrival, for the purpose of committing hostile acts involving destruction of life or property. 317 U.S. at 35-36, 63 S.Ct. 1. This charge, the Court explained, “has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law that we think it must be regarded as a rule or principle of the law of war.” Id. Similarly, in Ya-mashita, the Supreme Court held that a military commission had jurisdiction to try an invading Commanding General of the Imperial Japanese Army for breach of his duty to control the members of his command, by permitting them to commit atrocities against civilian populations and prisoners of war, because the charge “plainly” alleged a violation of the law of war, the purpose of which is “to protect civilian populations and prisoners of war from brutality.” 327 U.S. at 13-18, 66 S.Ct. 340.
The government has repeatedly conceded that the three offenses of which Bahlul was convicted are not, and were not at the time of Bahlul’s conduct, law-of-war offenses under international law. See Resp’t’s Br. 34 (regarding conspiracy only); Resp’t’s Pet. for Reh’g En Banc 1-2 (“the charges are not sustainable under Hamdan II because they have not attained recognition at this time as offenses under customary international law”); Resp’t’s pr&-Hamdan II Panel Br. 57 (“the offenses of conspiracy, solicitation, and providing material support to terrorism have not attained international recognition at this time as offenses under customary international law”); Oral Argument Tr. 15 (Sept. 30, 2013) (“we have conceded that [all three offenses] are not violations of the international law of war”). This should end the matter given Congress’s stated purpose and effect in the 2006 Act, 10 U.S.C. § 950p. Instead, departing from the instruction of more than half a century of Supreme Court precedent, the government contends that the en banc court can affirm Bahlul’s convictions on the basis of a U.S. common (or U.S. domestic) law of war. Because the court is vacating Bah-lul’s convictions for material support for terrorism and solicitation but not for inchoate conspiracy, see Op. at 5, I need address only Bahlul’s jurisdictional challenges to his conviction for inchoate conspiracy. It bears noting, however, that the court’s analysis of the infirmities of the government’s U.S. common law theory, based on Civil War military commissions and field orders, in vacating two of Bah-lul’s convictions applies no less to his conviction for inchoate conspiracy. See Op. at 27, 29, 30.
1. The trial record of the law-of-war military commission makes clear Bahlul was charged and convicted of inchoate conspiracy; his stand-alone conspiracy conviction did not depend upon proof of the completion of any object offense (such as murder) or proof that the overt acts in furtherance of the conspiratorial agreement of which he was convicted (such as preparing a propaganda video) were law-of-war offenses.
First, the government elected not to charge Bahlul under the Pinkerton doctrine under which he could have been found vicariously hable for reasonably foreseeable substantive crimes committed by his co-conspirators in furtherance of the conspiracy. See Resp’t’s Br. 47; Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The govern *39 ment also did not pursue the theory that Bahlul had joined a joint criminal enterprise. At the beginning of Bahlul’s trial, the prosecutor moved to strike the charge that Bahlul had “join[ed] al Qaeda, an enterprise of persons who share the common criminal purpose that involved, at least in part, the commission or intended commission of one or more substantive offenses triable by military commission.” Trial Tr. 110.
Second, the trial evidence allowed for conviction of no more than inchoate conspiracy. The government’s evidence consisted of Bahlul’s agreement with Usama bin Laden and other members of al Qaeda to commit law-of-war offenses and his commission of non-law-of-war, non-criminal overt acts in furtherance of the agreement. (The government’s focus at trial was on Bahlul’s role as an al Qaeda propagandist, in particular, his preparation of a recruitment video entitled “The Destruction of the American Destroyer U.S.S. Cole.”) None of the overt acts committed in furtherance of the charged conspiracy—including traveling to Afghanistan with the intent to join al Qaeda, undergoing military-type training at a training camp sponsored by al Qaeda, pledging fealty (or “ba-yat”) to Usama bin Laden, or transcribing the martyr wills of two of the September 11th hijackers—is a law-of-war offense. Even assuming being armed would have sufficed, the military commission found Bahlul not guilty of the overt act that he had “armed himself with an explosive belt, rifle, and grenades to protect and prevent the capture of Usama bin Laden.”
Third, the presiding military judge instructed the members of the military commission that to find Bahlul guilty of conspiracy, they must find beyond a reasonable doubt that he knowingly entered into an agreement to commit one or more substantive offenses triable by military commission and that he knowingly committed at least one overt act in furtherance of that agreement. Trial Tr. 845-46. The judge further instructed that proof the object of the conspiratorial agreement, the substantive law-of-war offense, “actually occurred is not required” and “[t]he overt act required for this offense does not have to be a criminal act.” Id. at 848-49. The presiding judge also confirmed that Bahlul was not being tried on the basis of a joint criminal enterprise; when he discovered that his written instructions included the word “enterprise,” the judge instructed the military commission members to strike the words “or enterprise,” explaining “that’s not before you,” id. at 881.
2. The international law of war does not recognize inchoate conspiracy as a law-of-war offense. Although there are two exceptions—conspiracy to commit genocide and conspiracy to wage aggressive war (also known as the commission of crimes against peace), see Hamdan, 548 U.S. at 610, 126 S.Ct. 2749 (plurality op.); 22 TRIAL op the Major War Criminals before the International Military TribuNAL: Nuremberg, 14 November 1945—1 October 1946, at 469 (1948) (“Trial of Major War Criminals at Nuremberg”); Antonio Cass-ese, International Criminal Law 191 (2008); see also Br. of Amici Curiae Int’l Law Scholars 12-14—the government does not argue that either applies to Bahlul.
Treaty law and international courts and tribunals have refused to recognize inchoate conspiracy as a war crime because of its potential for conflict with the international law-of-war principle “that criminal guilt is personal, and that mass punishments should be avoided.” Trial of Major War Criminals at Nuremberg at 500. Moreover, the Anglo-American concept of conspiracy is not known to some European legal systems. See Telford Taylor, The *40 ANATOMY OP THE NUREMBERG TRIALS: A PERSONAL Memoir 36 (1992) (“Taylor”). Neither the Hague Conventions nor the Geneva Conventions, which are the “major treaties on the law of war,” includes inchoate conspiracy as an international law-of-war offense. Hamdan, 548 U.S. at 603-04, 126 S.Ct. 2749 (plurality op.); see Convention with Respect to the Laws and Customs of War on Land, July 29, 1899, 32 Stat. 1803, 1 Bevans 247; Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631; Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609.
The International Military Tribunal convened at Nuremberg “pointedly refused to recognize as a violation of the law of war conspiracy to commit war crimes,” Ham-dan, 548 U.S. at 610, 126 S.Ct. 2749 (plurality op.), concluding that its charter “does not define as a separate crime any conspiracy except the one to commit acts of aggressive war.” Trial op Major War Criminals at Nuremberg at 469; see also Charter of the International Military Tribunal, in Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8,1945, 59 Stat. 1544, 82 U.N.T.S. 280; Taylor at 550-53. The Charter addressed the personal responsibility of the major war criminals of the European Axis. See Charter arts. 1, 6-8. The Tribunal was concerned that “overbroad application of the conspiracy principle may drag innocent people into the prosecution’s net.” Taylor at 553. The United States Military Tribunals convened to try additional defendants also concluded that they “ha[d] no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense.” 15 United Nations War Crimes Commission, Law Reports of Trials of War Criminals 90 (1949) (“Law Reports of Trials of War Criminals”). In addition, the Charter of the International Military Tribunal for the Far East did not confer jurisdiction over inchoate conspiracies to commit war crimes or crimes against humanity, only conspiracy to commit crimes against peace. See Charter of the International Military Tribunal for the Far East art. 5, Jan. 19, 1946, T.I.A.S. No. 1589, 4 Bevans 20.
Modern statutes defining international law-of-war offenses do not refer to conspiracy to commit such offenses (other than genocide). See Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for the Former Yugoslavia, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), reprinted in 32 I.L.M. 1159, 1192; Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), reprinted in 33 I.L.M. 1598, 1602; Statute of the Special Court for Sierra Leone, Jan. 16, 2002, 2178 U.N.T.S. 138. Additionally, international tribunals recognizing “joint *41 criminal enterprise” as a theory of liability for completed law-of-war offenses have rejected a separate inchoate offense based on “mere membership” or “conspiring to commit crimes,” and instead recognize liability only for “participation in the commission of the crime.” Prosecutor v. Miluti-novic, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanic’s Motion Challenging Jurisdiction—Joint Criminal Enterprise, ¶ 26 (Int’l Crim. Trib. for the Former Yugoslavia, Appeals Chamber, May 21, 2003); Rwamakuba v. Prosecutor, Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, ¶ 30 (Oct. 22, 2004); see also Br. of Amici Curiae Int’l Law Scholars 8-10.
3. Given this historical background, the government has a heavy burden to show that Congress’s purpose in enacting the 2006 Act extended to inchoate conspiracy as an “offense[] that ha[s] traditionally been triable by military commissions,” 10 U.S.C. § 950p(a). The government begins by suggesting that “a systemized body of international law establishing individual criminal responsibility for specific acts during warfare” commenced with the Hague Conventions of 1899 and 1907 and “is a relatively modern innovation.” Resp’t’s Br. 28 (citing Timothy L.H. McCormack, From Sun Tzu to the Sixth Committee: The Evolution of an International Criminal Law Regime, in The Law OF WAR CRIMES: NATIONAL AND INTERNATIONAL ApproaChes 31, 43 (Timothy L.H. McCormack & Gerry J. Simpson eds., 1997)). It continues by citing Colonel William Winthrop, referred to by the Supreme Court as the “Blackstone of Military Law,” Hamdan, 548 U.S. at 597, 126 S.Ct. 2749 (plurality op.) (quoting Reid, 354 U.S. at 19 n. 38, 77 S.Ct. 1222 (plurality op.)), for the proposition that prior to the adoption of these and later treaties, the “offenses in violation of the laws and usages of war [consisted of] those principally, in the experience of our wars, made the subject of charges and trial.” Resp’t’s Br. 29 (quoting William Winthrop, Military Law and PRECEDENTS 839 (1920) (“WlNTHROP PRECEDENTS”)). It also points to the reference in Hamdan to “the American common law of war,” 548 U.S. at 613, 126 S.Ct. 2749. Resp’t’s Br. 32. Neither Winthrop nor Hamdan advance the government’s case for sustaining Bahlul’s conspiracy conviction.
First, in discussing the Civil War military commissions relied upon by the government, Winthrop “excludes conspiracy of any kind from his own list of offenses against the law of war.” Hamdan, 548 U.S. at 608, 126 S.Ct. 2749 (plurality op.) (citing Winthrop Precedents at 839-40). Instead, Winthrop classifies the relevant Civil War conspiracy cases either as “[c]rimes and statutory offenses cognizable by State or U.S. courts, and which would properly be tried by such courts if open and acting,” or as a “combin[ation]” of such civilian crimes and “violations of the laws and usages of war cognizable by military tribunals.” Winthrop Preoedents at 839 & n. 5. Winthrop rejected the idea that inchoate conspiracy could be triable by law-of-war military commission, emphasizing that “the jurisdiction of the military commission should be restricted to cases of offence consisting in overt ads, i.e. in unlawful commissions or actual attempts to commit, and not in intentions merely.” Id. at 841. In other words, “ ‘overt acts ’ constituting war crimes are the only proper subject at least of those military tribunals not convened to stand in for local courts,” Hamdan, 548 U.S. at 608, 126 S.Ct. 2749 (plurality op.) (citing Winthrop Precedents at 841 & nn. 22, 23). The cases cited by the government reveal that this is the manner in which the Civil War military *42 commissions proceeded. See infra pt. I.C.1.
Second, the Supreme Court’s reference to “the American common law of war” in Hamdan, 548 U.S. at 613, 126 S.Ct. 2749, is to U.S. military commission tradition and practice as an additional constraint on, not an alternative basis for, military commission jurisdiction under Section 821. The Court stated that the Uniform Code of Military Justice, which includes Section 821, “conditions the President’s use of military commissions on compliance not only with the American common law of war, but also with the rest of the [Uniform Code of Military Justice] itself, insofar as applicable, and with the ‘rules and precepts of the law of nations.’ ” Id. (quoting Quirin, 817 U.S. at 28, 63 S.Ct. 1). To come within the “law of war” under Section 821, an offense must constitute both a violation of the international law of war and a violation of the law of war as traditionally recognized in U.S. military commissions. This is necessary because, as the Court explained in Quirin, there may be
acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.
317 U.S. at 29, 63 S.Ct. 1. Consequently, in Quirin, Yamashita, and Hamdan the Supreme Court sought to establish that the relevant offense was a violation of the law of war under international law and was recognized in U.S. military commissions. See Quirin, 317 U.S. at 35, 63 S.Ct. 1; Yamashita, 327 U.S. at 15-16, 66 S.Ct. 340; Hamdan, 548 U.S. at 603, 126 S.Ct. 2749 (plurality op.). Under these precedents, the practice of U.S. domestic military commissions is irrelevant as long as inchoate conspiracy is not an international law-of-war offense, and the government conceded that it is not. Of course, to the extent the government relies on the Military Commissions Act of 2009, which refers to offenses that have “traditionally been triable under the law of war or otherwise triable by military commission” to support its argument that the statute embraces “a class of offenses—lawfully triable in U.S. military commission practice— that is broader than the group of offenses that are currently prohibited by the international law of war,” Resp’t’s Br. 28 (quoting 10 U.S.C. § 950p(d) (2009) (emphasis added)), this cannot advance its position since Bahlul was tried under the 2006 Act.
The legislative history of the 2006 Act also does not advance the government’s position. The Report of the House Armed Services Committee on H.R. 6054 states “[f]or the reasons stated in Justice Thomas’s opinion [in Hamdan ], the Committee views conspiracy [to commit a war crime] as a separate offense punishable by military commissions.” H.R. REP. NO. 109-664, pt. 1, at 25 (2006). But Justice Thomas expressly acknowledged that “conspiracy” was understood as a law-of-war offense only when it went “beyond ‘intentions merely,’” and involved “unlawful” overt acts, 548 U.S. at 703, 126 S.Ct. 2749 (Thomas, J., dissenting). There was no occasion in Hamdan for Justice Thomas to address the validity of a conspiracy charge where, as in Bahlul’s case, “the overt act required ... does not have to be a criminal act,” Trial Tr. 849; Justice Thomas observed that Hamdan was “charged with the overt acts of providing protection, transportation, weapons, and other services to the enemy, acts which in and of themselves are violations of the laws of war,” 548 U.S. at 704, 126 S.Ct. 2749 (citation omitted).
*43 c.
Even assuming, contrary to Supreme Court precedent, that a U.S. common law of war tradition could serve as an independent basis for sustaining convictions by law-of-war military commissions for offenses that are not recognized under the international law of war or by then-existing statute, the government fails to establish a domestic tradition to sustain Bahlul’s inchoate conspiracy conviction. It not only fails to point to evidence comparable to the abundance of evidence “both here and abroad” relied upon by the Supreme Court in Quinn, 317 U.S. at 31-35 & nn. 10, 12, 63 S.Ct. 1, the government has not identified a single case where military commission jurisdiction has been sustained on the basis of a charge of inchoate conspiracy, much less a charge of conspiracy with instructions defining the limits of the government’s burden of proof that are comparable to those in Bahlul’s case.
1. The Civil War cases to which the government points are, in fact, consistent with Winthrop’s position. Further, as the Supreme Court cautioned, “[t]he Civil War precedents must ... be considered with caution” because military commissions “operated as both martial law or military government tribunals and law-of-war commissions” and thus “often charged hybrid crimes mixing elements of crimes ordinarily triable in civilian courts (like treason) and violations of the law of war.” Ham-dan, 548 U.S. at 596 n. 27, 609 n. 37, 126 S.Ct. 2749 (plurality op.); see also Winthrop PRECEDENTS at 839 & n. 5. For example, William Murphy, who was tried by military commission in 1865, was charged with “[cjonspiracy to burn and destroy steamboats and other property” and also with “[v]iolati[ng] the laws and customs of war,” by in fact burning and destroying a steamboat and by secretly crossing enemy lines and attempting to destroy a second boat. G.C.M.O. No. 107 (1866). These separate charges suggest that Murphy was tried by a tribunal serving as both a martial law court and a law-of-war military commission, and that the military commission classified the conspiracy charge as a civil crime, not as a “violation of the laws and customs of war.” Id. Only this understanding is consistent with the fact that Murphy’s conspiracy conviction was vacated because the civil courts were open and therefore the military commission “had no jurisdiction of his person or of his offence.” In re Murphy, 17 F.Cas. 1030, 1031, 1032 (1867). And because Murphy did in fact destroy a steamboat during wartime, his case provides no support for the government’s theory that a Civil War military tribunal had jurisdiction over conspiracy absent proof, much less absent any allegation, of a completed substantive law-of-war offense.
Similarly, the case of Henry Wirz, also cited by the government, does not provide evidence of a tradition on which to base affirmance of Bahlul’s inchoate conspiracy conviction. Confederate Army Captain Wirz was charged with conspiring to injure the health and destroy the lives of soldiers in the military service of the United States and “alleged to have personally committed a number of atrocities against his victims, including torture, injection of prisoners with poison, and use of ‘ferocious and bloodthirsty dogs’ to ‘seize, tear, mangle, and maim the bodies and limbs’ of prisoners, many of whom died as a result.” Hamdan, 548 U.S. at 609, 126 S.Ct. 2749 (plurality op.) (citing H.R. Doc. No. 314, 55th Cong., 3d Sess., 785, 789-90 (1899)). Notably, as the Hamdan plurality explained, the Judge Advocate General determined that one of Wirz’s alleged co-conspirators, R.B. Winder, should not be tried by military commission because “while the evidence at the trial of Wirz was deemed by the court to implicate him *44 in the conspiracy against the lives of all Federal prisoners in rebel hands, no such specific overt acts of violation of the laws of war are as yet fixed upon [Winder].” Id. (quoting H.R. Doe. No. 314, 55th Cong., 3d Sess., 783 (1899)) (emphasis in original opinion). In other words, had Wirz not committed overt acts that were violations of the law of war, he could not have been tried by military commission for conspiracy.
The 1865 trial of the Lincoln assassins, “even if properly classified as a trial by law-of-war commission,” Hamdan, 548 U.S. at 604 n. 35, 126 S.Ct. 2749 (plurality op.), likewise does not support the government’s theory of a U.S. common law-of-war tradition. The defendants were charged with both “conspiring” to murder President Lincoln and the completed offense of “maliciously, unlawfully, and traitorously murdering the said Abraham Lincoln,” G.C.M.O. No. 356 (1865); see Hamdan, 548 U.S. at 604 n. 35, 126 S.Ct. 2749 (plurality op.) (quoting H.R. Doc. 314, 55th Cong., 3d Sess., 696 (1899)); see also The Trial: The Assassination of PRESIDENT LINCOLN AND THE TRIAL OF THE Conspirators 246-47 (Edward Steers, Jr. ed., 2003). Of utmost significance, surely, the then-Attorney General, in defending the use of a military tribunal, treated the charge as alleging the substantive, completed “offence of having assassinated the President.” 11 Op. Atty. Gen. 297, 297 (1865). Furthermore, the district court, in rejecting petitions for a writ of habeas corpus filed by three of the assassins, described the charge of conviction as “a conspiracy to commit the military crime [of the assassination of the Commander in Chief] which one of their number did commit.” Ex Parte Mudd, 17 F.Cas. 954 (S.D.Fla.1868) (emphasis added). Recall that in Bahlul’s case the prosecution dismissed charges and theories of vicarious liability.
In sum, the Civil War conspiracy cases, including the trial of the Lincoln assassins, each, in fact, involved a completed law-of-war offense, not an inchoate conspiracy. These cases are consistent with Winthrop’s description of such conspiracies as among the “[c]rimes and statutory offenses ... which would properly be tried by [State or U.S.] courts if open and acting,” or alternatively, as hybrid crimes combining elements of crimes ordinarily triable in civilian courts and law-of-war offenses. Winthrop Preoedents at 839 & n. 5. They offer no reason to depart from Winthrop’s contemporary rejection of inchoate conspiracy as a law-of-war offense.
2. The World War II cases cited by the government also do not establish historical support for the jurisdiction of law-of-war military commissions over inchoate conspiracy. Although the Nazi saboteurs in Quirin were charged with conspiracy, the Supreme Court affirmed their convictions based on the independent charge that they had violated the law of war by crossing behind enemy lines having removed their uniforms, with the purpose of committing sabotage. See Quirin, 317 U.S. at 48, 63 S.Ct. 2. “The offense was complete when with [hostile] purpose they entered—or, having so entered, they remained upon— our territory in time of war without uniform or other appropriate means of identification.” Id. at 38, 63 S.Ct. 2. Like the case of the Lincoln conspirators, Quirin involved a completed law-of-war offense, not an inchoate conspiracy conviction like Bahlul’s. “If anything, Quinn supports [the] argument that conspiracy is not a violation of the law of war,” because “[t]he Court was careful in its decision to identify an overt, ‘complete’ act” and “took seriously the saboteurs’ argument that there can be no violation of law of war—at least not one triable by military commission—without the actual commission or attempt to *45 commit a ‘hostile and warlike act.’ ” Ham-dan, 548 U.S. at 606-07, 126 S.Ct. 2749 (plurality op.) (quoting Quirin, 817 U.S. at 37-38, 63 S.Ct. 1). Brigadier General Mark Martins, the Chief Prosecutor of Military Commissions in the Department of Defense since June 2011, likewise characterized Quiñn as an authority “supporting [the] rationale” that conspiracy may be tried under the law of war in conjunction with a completed offense that appears on the charge sheet, but not as an inchoate offense. Memorandum from Mark S. Martins, Chief Prosecutor of Military Commissions, Dep’t of Defense, to the Convening Authority 4 (Jan. 6, 2013).
The government’s reliance on Colepaugh v. Looney, 235 F.2d 429 (10th Cir.1956), is misplaced. The Tenth Circuit followed Quiñn in affirming the denial of a habeas petition filed by another World War II saboteur. Colepaugh had been convicted on three charges: (1) he “secretly passed through, in civilian dress, contrary to the law of war, the military and naval lines of the United States for the purpose of committing espionage, sabotage and other hostile acts;” (2) he “appeared and remained in civil dress, contrary to the law of war behind the military lines of the United States for the purpose of committing espionage, sabotage and other hostile acts;” and (3) “conspiracy to commit the above substantive offenses.” Id. at 431. Like the Supreme Court in Quinn, the Tenth Circuit looked to the “body of international common law known as the law of war,” id. at 431-32, and concluded that Colepaugh was not entitled to relief because he had committed the same substantive law-of-war offense as the saboteurs in Quiñn when he entered this country and discarded his uniform for the purpose of committing hostile acts involving the destruction of life or property, id. at 432 (quoting Quinn, 317 U.S. at 35, 63 S.Ct. 1). The court also followed the Supreme Court in not confirming the validity of the separate conspiracy charge. Consequently, this case, like Quiñn, provides no support for the government’s theory that Bahlul could be tried by military commission for inchoate conspiracy absent any charge that he committed a substantive law-of-war offense.
3. In sum, “[f]ar from making the requisite substantial showing, the Government has failed even to offer a ‘merely colorable’ case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission,” Hamdan, 548 U.S. at 611, 126 S.Ct. 2749 (plurality op.) (citation omitted). As the plurality in Hamdan explained:
The crime of ‘conspiracy’ has rarely if ever been tried as such in this country by any law-of-war military commission not exercising some other form of jurisdiction, and does not appear in either the Geneva Conventions or the Hague Conventions—the major treaties on the law of war. Winthrop explains that under the common law governing military commissions, it is not enough to intend to violate the law of war and commit overt acts in furtherance of that intention unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt.
Id. at 603-04, 126 S.Ct. 2749 (citing Winthrop PRECEDENTS at 841).
Insofar as the government proposes, contrary to Supreme Court precedent, a U.S. common law of war basis for sustaining Bahlul’s conspiracy conviction, the government’s proposal is also “unmoored from any enumerated power and has no rational stopping place.” Pet’r’s Br. 32. Such a theory suggests that modern military commissions could try defendants for any offense that approximates a charge previous *46 ly brought before any type of military tribunal, including Civil War era military commissions convened to try ordinary civilian crimes. See id.
The government’s interpretation of Congress’s intent in enacting the 2006 Act, additionally, leaves no room for consideration of the reasons the international community has rejected inchoate crimes as law-of-war offenses: for example, their dragnet effect could sweep in and condemn as war criminals the line soldier who merely pledged allegiance to the enemy as well as the errant but innocent delivery boy or shepherd who was on the wrong street at the wrong time. See Taylor at 553; Br. of Amicus Curiae Int’l Law Scholars 7, 15-18. The Supreme Court has long understood the role of military commissions to arise from the military necessity in the midst of war “to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war,” Quirin, 317 U.S. at 28-29, 63 S.Ct. 1; Hamdan, 548 U.S. at 596, 126 S.Ct. 2749 (plurality op.), not to try and convict (as distinct from holding as prisoners of war) anyone who is a member of the opposing forces. The law of war governing the use of military commissions is a product of the costly lessons learned in the last century from two World Wars, including the principle that, as a matter of international law, law-of-war offenses are about personal responsibility for war crimes, not collective guilt. See Trial of Major War Criminals at Nuremberg at 500. It seems unlikely the Congress that enacted the 2006 Act intended to cast aside such costly learning without expressly indicating that it intended to do so; by using the phrase “offenses that have traditionally been triable,” 10 U.S.C. § 950p(a) (emphasis added), in stating its purpose, Congress signaled it was adhering to the established understanding of the role of military commissions, not breaking new ground.
And, even assuming arguendo that practices of U.S. military commissions could provide an independent basis upon which to support the jurisdiction of a law-of-war commission to try an offense not recognized in international law, nor codified in statute at the time, the government’s failure to demonstrate that such a “tradition! ]” existed at the time of the charged conduct requires vacatur of Bahlul’s inchoate conspiracy conviction.
Were the implications for the separation of powers raised by trial by military commission not “of the highest order,” Hamdan, 548 U.S. at 638, 126 S.Ct. 2749 (Kennedy, J., concurring in part), the government’s effort to establish its inchoate conspiracy theory on the basis of so meager and deficient an historical showing that it was among the “offenses that have traditionally been triable by military commissions,” 10 U.S.C. 950p(a) (2006) (emphasis added), might be less problematic. After all, the war on terror is unlike recent wars waged among sovereign nations whose troops wore identifiable uniforms, and two Presidents have employed a modern “enemy combatant” military justice regime. See, e.g., Boumediene v. Bush, 553 U.S. 723, 733, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); Hamdan, 548 U.S. at 570 & n. 1, 126 S.Ct. 2749. But in codifying “offenses that have traditionally been triable by military commissions” in the 2006 Act, Congress did not encourage or permit any blurring of the jurisdictional lines between military commissions and Article III courts. The Article III courts were open for prosecuting September 11 perpetrators and other members of al Qaeda for inchoate conspiracy or other federal crimes. Only years later did Congress bar the President from using appropriated funds to bring Guanta- *47 ñamo detainees into the United States for any purpose. The President has opposed such restrictions on the ground that they strip the Executive Branch of “the authority to determine when and where to prosecute Guantanamo detainees, based on the facts and circumstances of each case and our national security interests”— when the Administration wishes to employ federal prosecutions [in Article III courts] as “a legitimate, effective, and powerful tool in our efforts to protect the Nation.” See Statement by the President on H.R. 3304 (Dec. 26, 2013). So far, Congress has not been persuaded to remove the restrictions. In the meantime, the court has a duty “in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty.” Quinn, 317 U.S. at 19, 63 S.Ct. 1. Hewing to the jurisdictional limits for law-of-war military commissions, as Supreme Court precedent instructs, preserves the separation of powers under which law-of-war military commissions are confined to their historical role as necessities, not conveniences, of war. Congress’s unequivocal statement of its purpose and effect in section 950p of the 2006 Act is consistent only with the understanding that it intended to maintain the traditional jurisdictional lines.
II.
There is still another reason why Bah-lul’s conviction for inchoate conspiracy (and the other two convictions) must be reversed if the 2006 Act is applied retroactively. See Op. at 11. Even assuming, contrary to its express statement of the intended “effect” of the 2006 Act, 10 U.S.C. § 950p(b), that Congress intended the 2006 Act to apply retroactively to create new offenses triable by military commissions, Bahlul’s convictions must be vacated under the Ex Post Facto Clause of the Constitution. U.S. Const, art. I, § 9, cl. 3.
A.
Bahlul’s Ex Post Facto Clause challenge to his convictions is properly reviewed de novo for any one of three reasons. In applying a plain error standard of review, the majority imposes a magic-words requirement nowhere to be found in the precedent of the Supreme Court or in the Uniform Code of Military Justice as interpreted by the Court of Appeals for the Armed Forces. See, e.g., United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
Bahlul unambiguously objected to his trial on the grounds he was being charged with offenses that did not exist at the time of his alleged conduct. Although he did not refer specifically to the Ex Post Facto Clause, his pretrial colloquy with the presiding military judge invoked its principles and alerted the military commission to the substance of his objection, which is all that is required to preserve an objection. See, e.g., United States v. Breedlove, 204 F.3d 267, 270 (D.C.Cir.2000). The Ex Post Fac-to Clause is designed both “to assure that legislative Acts give fair warning of their effect” and to “restraint] arbitrary and potentially vindictive legislation.” Weaver v. Graham, 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). Bahlul objected to the judge that after the events of September 11, 2001, this country had “put on the side, the meaningless American laws, the United Nations, ... the world codes, the international law and what branches out of it and the international war laws and the Geneva Conventions and the internal American law—military law, and the civil law—American civil law” and instead had “legislated new laws and this military commission.” Trial Tr. 23. Bahlul repeated that the United States had “estab *48 lished a new law in the land, for me and for any person that stands in front of you or before you in the war in the entire world; but specifically, the Islamic world, and specifically also, the Mujahideen Regime.” Id. at 24. He accused the United States of “getting confused between laws and going in an empty circle ... [bjeeause today, you set a law that would impact you tomorrow, and then you will change it, or adjust it, or add to it.” Id. at 25.
With these arguments, Bahlul expressly challenged the “new laws and this military commission” that was to try him as divorced from both international and American law principles and as constructed after-the-fact for the purpose of trying members of al Qaeda. Bahlul’s objections to “new laws” being applied to him and to “changing],” “adjusting],” and “add[ing] to” existing laws .are the considerations animating the ex post facto prohibition. The presiding military judge understood Bahlul’s arguments and his decision to “boycott” the military commission proceedings to be a motion to dismiss for lack of jurisdiction, because the law that created the proceedings was unlawful or the charges did not state an offense. Id. at 98-99.
Even if Bahlul had forfeited his ex post facto challenge, de novo review of a forfeited issue is permitted where the lower court has “nevertheless addressed the merits of the issue.” Blackmon-Malloy v. Capitol Police Bd., 575 F.3d 699, 707 (D.C.Cir.2009) (citing United States v. Williams, 504 U.S. 36, 41, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992)); see United States v. Hemandez-Rodriguez, 352 F.3d 1325, 1328 (10th Cir.2003); cf. Milhouse v. Levi, 548 F.2d 357, 363 (D.C.Cir.1976); United States v. Gorski 47 M.J. 370, 375 (C.A.A.F.1997). This principle applies in both criminal and civil cases. See Williams, 504 U.S. at 41, 112 S.Ct. 1735. The Court of Military Commission Review considered Bahlul’s constitutional Ex Post Facto Clause objection on the merits, 820 F.Supp.2d 1141, 1218 (C.M.C.R.2011), and this court may as a matter of discretion consider Bahlul’s challenge under a de novo standard of review. Given that Bah-lul’s objections go to the fundamental issue of the military commission’s jurisdiction, this court should apply de novo review.
Furthermore, under the Rules of Military Commissions, Bahlul’s challenge to the military tribunal’s jurisdiction and the charges against him cannot be waived or forfeited and is reviewed de novo. Rule 905(e) provides, in relevant part, that failure to raise defenses or objections or to make motions or requests “except lack of jurisdiction or failure of a charge to allege an offense” at the appropriate time “shall constitute waiver.” See The Manual for Military COMMISSIONS, at 11-83-84 (2007). The rule thus defines “waiver” to include forfeiture. Similarly, Rule 907(b)(1), “Nonwaivable grounds,” states that “[a] charge or specification shall be dismissed at any stage of the proceedings if: (A) The military commission lacks jurisdiction to try the accused for the offense; or (B) The specification fails to state an offense.” Id. at 11-87. As the presiding military judge concluded, Bahlul’s retroactivity objection is a claim that the charges against him fail to state an offense. Cf Moore’s Federal PRACTICE § 612.04 (Lexis 2014) (“The defense of failure to charge an offense may be based on ... the unconstitutionality of the statute relied upon.”); see also United States v. Haddock, 956 F.2d 1534, 1542 (10th Cir.1992), abrogated on other grounds by United States v. Wells, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997); United States v. Gilbert, 813 F.2d 1523, 1528-29 (9th Cir.1987); United States v. Seuss, 474 F.2d 385, 387 n. 2 (1st Cir.1973).
*49 B.
The government concedes that the Ex Post Facto Clause applies in military commission prosecutions under the 2006 Act of detainees at Guantanamo Bay. See Resp’t’s Br. 64. This conclusion follows from Boumediene, 553 U.S. at 766-71, 128 S.Ct. 2229. Like the Suspension Clause at issue there, the Ex Post Facto Clause is “one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights,” id. at 739, 128 S.Ct. 2229, and serves both to protect individuals and to preserve the Constitution’s separation-of-powers structure. See id. at 739-46, 128 S.Ct. 2229; Landgraf, 511 U.S. at 267-68, 114 S.Ct. 1483; Weaver, 450 U.S. at 29 n. 10, 101 S.Ct. 960. “Because the Constitution’s separation-of-powers structure ... protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles.” Boumediene, 553 U.S. at 743, 128 S.Ct. 2229. The Court’s analysis of the extraterritorial reach of the Suspension Clause applies to the Ex Post Facto Clause because the detainees’ status and location at Guantanamo Bay are the same, and the government has pointed to no distinguishing “practical obstacles” to its application. See id. at 766, 128 S.Ct. 2229. The 2006 Act, in providing that it “does not establish new crimes that did not exist before its enactment,” 10 U.S.C. § 950p(a), fairly demonstrates Congress’s implied recognition of the reach of the fundamental protections embodied in the Ex Post Facto Clause.
Ex post facto laws are “contrary to the great first principles of the social compact,” Calder, 3 Dali, at 388 (opinion of Chase, J.), and are “condemned by the universal sentence of civilized man” as “oppressive, unjust, and tyrannical,” Ogden v. Saunders, 25 U.S. 213, 266, 12 Wheat. 213, 6 L.Ed. 606 (1827). The Ex Post Facto Clause both “ensures that individuals have ‘fair warning’ about the effect of criminal statutes,” Landgraf, 511 U.S. at 267-68, 114 S.Ct. 1483 (citation omitted), and serves as a meaningful structural constraint imposed by Article I that goes “to the very root of the power of Congress to act all,” Downes v. Bidwell, 182 U.S. 244, 277, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (opinion of Brown, J.); see also Weaver, 450 U.S. at 29-30, 101 S.Ct. 960. It “safeguards ‘a fundamental fairness interest ... in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.’ ” Peugh v. United States, — U.S.-, 133 S.Ct. 2072, 2085, 186 L.Ed.2d 84 (2013) (quoting Carmell v. Texas, 529 U.S. 513, 533, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000)). And it “upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law.” Weaver, 450 U.S. at 29 n. 10, 101 S.Ct. 960.
Tellingly, when ratified and now, the Ex Post Facto Clause addresses the risk that, in response to political pressures, the legislature “may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.” Landgraf, 511 U.S. at 266, 114 S.Ct. 1483; see Weaver, 450 U.S. at 29, 101 S.Ct. 960. By safeguarding the boundaries between the branches of government, the Clause promises that accusations that this country has, in Bahlul’s words, “put [our laws] on the side” and “established a new law” for our enemies, Trial Tr. 23-24, will lack merit. Yet in an odd turn of phase for addressing “one of the most basic presumptions of our law,” Johnson, 529 U.S. at 701, 120 S.Ct. 1795, the government urges that the Clause “should apply flexibly” here “because of the common law nature of military proceedings” and “because Bah- *50 lul’s conduct was criminal when done,” albeit under statutes providing for prosecution in an Article III court. Resp’t’s Br. 62-63, 67. The government’s “flexible” approach to the Ex Post Facto Clause, relying on the position that Bahlul’s conduct may have been proscribed by laws other than those under which he was charged and convicted, “is a standardless exercise in crime by analogy,” Pet’r’s Reply Br. 21, that the Supreme Court has condemned, see, e.g., Papachristou v. Jacksonville, 405 U.S. 156, 168-69, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), and the law of war forbids, see, e.g., Rome Statute of the International Criminal Court art. 22, July 17, 1998, 2187 U.N.T.S. 90; 6 Law Reports of TRIALS of War Criminals at 95 (practices such as “application of principles of law condemned by the practice of civilised nations such as punishment by analogy ... are all properly classed as war crimes”).
C.
Article I military commissions are an extraordinary tool designed to permit the military to infringe on the Article III power of the judiciary only to accomplish specific and discrete objectives. Through the use of military commissions, the government can provide a substitute for civilian courts in occupied territories and in places where martial law has been declared. See Hamdan, 548 U.S. at 595-96, 126 S.Ct. 2749 (plurality op.); see id. at 683, 126 S.Ct. 2749 (Thomas, J., dissenting). As relevant here, military commissions may be convened as an “incident to the conduct of war,” to prosecute law-of-war offenses. Quirin, 317 U.S. at 28-29, 63 S.Ct. 1; see Hamdan, 548 U.S. at 596-97, 126 S.Ct. 2749 (plurality op.); 10 U.S.C. § 948b(a) (2006). The retroactive expansion of the jurisdiction of Article I law-of-war military commissions to include offenses that “have [not] traditionally been triable by military commissions,” however, contravenes the structural limitations embodied in the Ex Post Facto Clause.
This appears to be a test case brought by the government to establish the jurisdiction of law-of-war military commissions over inchoate conspiracy where the government has evidence the defendant entered into an agreement to engage in terrorist acts against the United States, but no evidence the defendant committed an overt act that was a law-of-war offense in furtherance of the agreement. This approach may assist the Executive Branch in surmounting obstacles to prosecutions in Article III courts caused by Congress’s recent restrictions on the use of appropriated funds to bring Guantanamo detainees into the United States. See, e.g., Statement by the President on H.R. 3304 (Dec. 26, 2013). But it puts at risk the separation of powers and the ex post facto principle by ignoring Congress’s plain statement of purpose and effect in the 2006 Act, the “traditional ]” jurisdiction of military commissions, and the international community’s rejection of inchoate offenses as law-of-war offenses.
Accordingly, the inchoate conspiracy charge of which Bahlul was convicted under the 2006 Act does not support the jurisdiction of the military commission and this conviction must be vacated as well as the two convictions vacated by the court. All three convictions must be vacated as violations of the Ex Post Facto Clause. It remains for the Administration to decide whether to bring other charges against Bahlul before a military commission or whether to charge him in an Article III court. To the extent that Congress has created an obstacle to bringing Bahlul to the United States, Congress can remove it. The question whether Congress has imper-missibly intruded upon the President’s Article II powers is not before the court. In *51 the meantime, “[t]he laws and Constitution are designed to survive, and remain in force, in extraordinary times. Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law.” Boumediene, 553 U.S. at 798, 128 S.Ct. 2229. I concur in the judgment vacating Bahlul’s convictions for material support and solicitation, and I respectfully dissent with regard to affir-mance of Bahlul’s conviction for inchoate conspiracy.